**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **DOUG STREET,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) CIVIL NO. 06-424-PMF |
| | ) |
| **MICHAEL J. ASTRUE, Commissioner** | ) |
| **of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

**MEMORANDUM AND OPINION**

**FRAZIER, Magistrate Judge:**

Plaintiff, Douglas A. Street, seeks judicial review of a final decision of the Commissioner of Social Security denying his July, 2003, application for disability benefits.[1] The application was denied following a determination by an Administrative Law Judge (ALJ) that Mr. Street was not disabled. That decision became final when the Appeals Council declined to review the decision. Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g).

To receive disability benefits, a claimant must be "disabled." A disabled person is one whose physical or mental impairments result from anatomical, physiological, or psychological abnormalities which can be demonstrated by medically acceptable clinical and laboratory diagnostic techniques and which prevent the person from performing previous work and any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A).

The Social Security regulations provide for a five-step sequential inquiry that must be followed

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted as the defendant in this action.

in determining whether a claimant is disabled.  20 C.F.R. § 404.1520.  The Commissioner must determine in sequence: (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets or equals one listed by the Commissioner, (4) whether the claimant can perform his or her past work, and (5) whether the claimant is capable of performing any work in the national economy.  *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).  If the claimant does not have a listed impairment but cannot perform his or her past work, the burden shifts to the Commissioner at Step 5 to show that the claimant can perform some other job.  *Id*.

The ALJ evaluated plaintiff's application through Step 5 of the sequential analysis.  The ALJ concluded that Mr. Street's medical conditions significantly interfered with his ability to perform basic work activities but did not meet or equal one of the impairments listed in the Social Security regulations.  The ALJ also determined that, despite his functional limits, plaintiff retained the ability to lift 10 pounds frequently and 20 pounds occasionally, sit for a total of six hours in an eight-hour workday, and stand or walk for a total of six hours in an eight-hour workday.  The ALJ decided that plaintiff was further limited to work task requiring no depth perception, an option to sit or stand, and no more than occasional contact with supervisors and co-workers.  After hearing testimony from a vocational expert, the ALJ decided that plaintiff could perform a substantial number of jobs, such as packager, machine operator, and inspection positions (R. 16-24).

Under the Social Security Act, a court must sustain the Commissioner's findings if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "more than a mere scintilla" of proof.  The standard is satisfied by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999).  Because the Commissioner of Social Security is

responsible for weighing the evidence, resolving conflicts in the evidence, and making independent findings of fact, this Court may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Id*. However, the Court does not defer to conclusions of law, and if the Commissioner makes an error of law or serious mistakes, reversal is required unless the Court is satisfied that no reasonable trier of fact could have come to a different conclusion. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).

## I.   Weight Assigned to Treating Physician Opinions

Plaintiff argues that the Commissioner's final decision should be reversed because the ALJ did not give appropriate weight to findings made by his treating physician.[2] Defendant responds that the ALJ properly assessed this medical evidence.

Plaintiff suffered a traumatic injury when he fell from a scaffold in February, 1999. In August, 1999, x-rays were interpreted as showing osteoarthritis, with slight spurring in the left knee and moderate spurring in the lumbosacral portion of the spine (R. 185). Dr. Sunga referred plaintiff to Dr. Wolf, who found no fracture or dislocation and initially diagnosed a knee contusion (R. 156). At that time, plaintiff's physical exam revealed that he had no significant swelling, slight tenderness, and good range of motion. A neurological exam showed that his sensation and pulses were intact, and his motor strength was normal with "slight" give away in the quadriceps muscle (R. 155-56).

In September, 1999, an MRI study was interpreted as showing a tear of and degeneration of

---

[2] On August 2, 2006, the parties were directed to include in their briefs a discussion of the law applicable to each issue raised. The law mentioned in plaintiff's brief pertains to ALJ evaluations of medical opinion evidence (Doc. No. 24, p. 11). While plaintiff's discussion drifts to other topics, the Court will focus on the issue supported by citation to applicable law. *Ehrhart v. Secretary of Health and Human Services*, 969 F.2d 534, 537 (7th Cir. 1992)(finding poorly developed issues waived).

the meniscus, as well as a cystic lesion at the knee joint. Dr. Wolf performed surgery with partial meniscectomy and debriding of the lesion. Dr. Wolf felt that plaintiff showed temporary improvement, then backslided and progressed very slowly overall (R. 150-52).

In October, 2000, MRI testing of plaintiff's spine showed a very small right foraminal protrusion at the L4-5 region. This abnormality produced mild inferior foraminal narrowing without definitive nerve root compression, which was expected to correlate with right L4 radicular symptoms (R.184).

In February, 2001, plaintiff's condition was evaluated by Dr. Gibbs, a neurosurgeon, who detected a discrepancy in leg length and formed the impression that plaintiff suffered pain in his back and legs due to a sacroiliac joint dysfunction. He prescribed anti-inflammatory medication and recommended physical therapy and chiropractic treatment. Surgical intervention was not recommended (R. 131-135).

In March, 2001, plaintiff was evaluated by Patricia Burks, a licensed physical therapist, who assessed low back pain, left lower extremity pain, and reduced functional capacity due to pain. The assessing and treating therapists also noted a leg length discrepancy (R. 157-165).

In April, 2001, Dr. Wolf reevaluated plaintiff's knee condition. A new MRI study showed a small effusion, a horizontal tear involving the horn of the medial meniscus, a small cyst, and joint effusion. These findings were not significantly different from the previous study. Further treatment involving meniscectomy and or cartilage transfer was discussed (R. 144-152). Later the same month, plaintiff was discharged from physical therapy after seven visits, having achieved all goals (R. 157). He continued chiropractic treatment until October, 2001 (Doc. No. 173).

In August, 2002, plaintiff was treated in the emergency room for asthmatic bronchitis (R. 166).

In December, 2002, plaintiff's gallbladder was evaluated with sonogram. The results were

interpreted as negative (R. 182).

In July, 2003, plaintiff was seen twice by Dr. Sunga, who diagnosed low back pain with radiculopathy.

In October, 2003, plaintiff was seen again by Dr. Sunga, who observed signs of lumbar tenderness and swelling in the left knee, as well as a positive Lasegue's sign bilaterally and a restricted range of motion in the lumbar portion of plaintiff's spine. He prepared forms reflecting his diagnoses of obesity, hypertension, osteoarthritis, chronic lumbar pain with radiculopathy, chronic anxiety, post-traumatic left knee pain, and peptic ulcer disease. Dr. Sunga indicated that these disorders had persisted for years. He related plaintiff's subjective complaints of back pain, shooting pain in the legs, left knee pain, hip and joint pain, headaches, dizziness, sinus congestion, shortness of breath, feelings of depression and anxiety, fatigue, malaise, and morning stiffness.[3] He further indicated that plaintiff performed household chores with difficulty and received no treatment for his ailments due to financial difficulties. He reported that plaintiff used a cane at times while walking but was able to do normal lifting and carrying. He thought plaintiff would need to shift positions to relieve symptoms of pain and estimated that he could sit or stand for one or two hours at a stretch (R. 175-181).

In February, 2004, Dr. Sunga evaluated plaintiff's complaints of severe shoulder, back, neck, leg, and knee pain and leg numbness. Physical findings included tenderness in the right upper quadrant, multiple joint tenderness, limitation of motion in the left shoulder, and positive Lasegue's sign. Dr. Sunga diagnosed chronic back pain with radiculopathy, hypertension, peptic ulcer disease, obesity, and degenerative osteoarthritis. Medication indicated for relief of pain was prescribed and plaintiff was encouraged to lose weight and monitor his blood pressure (R. 276-77).

---

[3] Some of the information provided by Dr. Sunga is not legible.

Also in February, 2004, plaintiff's condition was evaluated by Dr. Chappa, who detected a decreased range of motion in the left knee and lumbar spine with mild paravertebral muscle spasms and a positive Lasegue's sign on the left. Plaintiff had a good hand grip, could perform fine and gross manipulation, and had no motor weakness or atrophy. His peripheral pulses and knee, ankle, triceps, and biceps reflexes were symmetric. Dr. Chappa observed that plaintiff could walk without assistance and said he did not need any ambulatory aids. Dr. Chappa's impressions included lumbar radiculopathy and left knee pain. He noted that medication for hypertension had been prescribed but was not taken due to financial limitations (R. 190-192).

In April, 2004, Dr. Sunga evaluated plaintiff's complaints of joint and muscle pain. Physical findings included multiple joint tenderness, restricted shoulder movement, and positive Lasegue's sign. He diagnosed pain medication intolerance, osteoarthritis, right anterior chest wall pain, hypertension, and peptic ulcer disease. Medication indicated for pain relief was prescribed, diagnostic studies were recommended, and plaintiff was encouraged to increase his activity as tolerated (R. 274-75).

In July, 2004, Dr. Sunga evaluated plaintiff's complaints of pain in the upper right quadrant, neck, back, joint, and knee. On examination, he noted tenderness in these areas and sensitive skin in the upper right quadrant. He diagnosed right anterior upper abdominal wall pain with hyperesthesia, degenerative osteoarthritis with severe neck pain, lumbar pain, joint pain, right leg radiculopathy, hypertension, and peptic ulcer disease. Plaintiff was referred to Dr. Howard for further evaluation of abdominal pain (R. 271-73).

In August, 2004, Dr. Howard evaluated plaintiff's condition and detected tenderness in the upper right quadrant. He formed the impression that plaintiff might have gall bladder disease, peptic

ulcer disease, an abdominal strain, or a hernia.  Plaintiff was advised to follow a low-fat diet and take acid suppressant medicine for two or three weeks (R. 235).

In October, 2004, Dr. Sunga evaluated plaintiff's complaints of pain in various areas, finding cervical tenderness, lumbar tenderness, right upper quadrant tenderness, hypogastric tenderness, and positive Lasegue's sign on the right leg.  He diagnosed peptic ulcer disease, right anterior abdominal wall possible neuropathy, back pain, hip pain, shoulder pain, right leg radiculopathy, and hypertension.  Medication was prescribed, and plaintiff was advised to engage in activity as tolerated (R. 269-270).

In January, 2005, Dr. Sunga evaluated plaintiff's complaints of back, leg, neck, and shoulder pain, as well as loss of sensation and weakness in the shoulder and hands.  He detected benign cold shoulder, arm tenderness, decreased arm strength, and positive Lasegue's sign and diagnosed depression with possible bipolar disorder, degenerative osteoarthritis with intractable lumbar cervical pain, bilateral arm weakness, neuropathy of the lower extremities, peptic ulcer disease, and hypertension.  Plaintiff was advised that he would be referred to a pain clinic when he could afford treatment.  In the meantime, pain relief medication was prescribed and plaintiff was referred for a mental health consultation (R. 262-66).

In February, 2005, Dr. Sunga reviewed plaintiff's condition and listed plaintiff's ailments as bipolar disorder, osteoarthritis, peptic ulcer disease, chronic back pain, L4-L5 disc herniation with foraminal stenosis, chronic obesity, and hypertension.  He encouraged plaintiff to quit smoking but made no other changes to his treatment (R. 260-261).

Also in February, 2005, plaintiff's mental condition was evaluated with a diagnosis of bipolar disorder with four extremely severe problem areas and a global assessment of functioning rating of

61. He subsequently participated in individual and group therapy, interacted appropriately in group discussion, and made progress (R. 196-213, 245-252).

In March, 2005, plaintiff requested and received a refill of pain medication (R. 259).

In June, 2005, Dr. Sunga evaluated plaintiff's condition on two occasions and observed tenderness in multiple joints, the spine, the shoulders, and abdomen. He assessed diarrhea, obesity, multiple joint pain, L4-L5 disc protrusion/herniation, hypertension, peptic ulcer disease, possible sleep paralysis, possibly auditory hallucination, and headache. He instructed plaintiff not to drive, adjusted plaintiff's medications, and urged activity as tolerated (R. 253-256).[4]

---

In suggesting that the ALJ failed to properly weigh medical opinion evidence, plaintiff relies on *Spielberg v. Barnhart*, 367 F.Supp.2d 276 (E.D. N.Y. 2005). The *Spielberg* decision is based on the usual standard governing ALJ evaluations of treating source opinions. When a treating source offers an opinion regarding the nature and severity of an impairment, the opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence. *See* 20 C.F.R. § 404.1527(d). Plaintiff argues that the ALJ should have given Dr. Sunga's opinions controlling weight. Defendant responds that the ALJ properly tempered the weight accorded Dr. Sunga's statements.

The ALJ's report shows that Dr. Sunga's statements were reviewed and considered. The ALJ reduced the weight assigned to Dr. Sunga's statements for a variety of reasons. First, Dr. Sunga did

---

[4] Because the ALJ's decision is reviewed, information added to the record after the ALJ made the decision does not show reversible error. *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994); *Eads v. Secretary*, 983 F.2d 815, 817-18 (7th Cir.1993); *Wolfe v. Shalala*, 997 F.2d 321, 322 n. 3 (7th Cir 1993).

not document significant limitations until after plaintiff's insured status expired on December 31, 2004. Second, some of Dr. Sunga's reports were incomplete and some reports contained inconsistent statements. Third, the limitations mentioned did not show that plaintiff was totally unable to perform gainful employment. Finally, some office visit notes were lacking. For these reasons, the ALJ gave Dr. Sunga's statements only slight weight (R. 18 - 21).

The Court is not persuaded that the ALJ applied the wrong legal standard when weighing Dr. Sunga's medical opinions. The ALJ properly observed that some comments describing limitations were offered after plaintiff's insured status expired and were therefor marginally relevant. The record supports the ALJ's impression that some of Dr. Sunga's reports were incomplete or contained inconsistent statements or were not adequately supported by office notes. Moreover, the ALJ's assessment of this evidence does not significantly detract from the ALJ's decision because Dr. Sunga's opinions do not clearly show that plaintiff lacked the physical or mental ability to perform the tasks associated with a limited range of light work. To the extent plaintiff asks the Court to reweigh this evidence or draw other inferences from the evidence, the invitation must be declined.

**II.     Substantial Evidence**

Plaintiff may also be arguing that the ALJ reached a decision that is not supported by substantial evidence. The ALJ's findings have been considered in light of the entire administrative record. The findings made are supported by evidence that a reasonable person would deem adequate.

**III.    Conclusion**

The Commissioner's final decision denying Douglas Street's July, 2003, application for disability benefits is AFFIRMED.

**SO ORDERED:  September 20, 2007  .**

                                          *s/Philip M. Frazier*
                                          **PHILIP M. FRAZIER**
                                          **UNITED STATES MAGISTRATE JUDGE**